**ST. JUDE MEDICAL, INC., Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 93–2642.

United States Court of Appeals, Eighth Circuit.

Submitted May 11, 1994.

Decided Sept. 9, 1994.

Carter G. Bishop, Minneapolis, MN, argued (Richard Ihrig and Ann Grossman, on the brief), for appellant.

Frank Cihlar of Washington, DC, argued (Gary R. Allen and David English Carmack, on the brief), for appellee.

Before MAGILL, Circuit Judge, FLOYD R. GIBSON, and JOHN R. GIBSON, Senior Circuit Judges.

MAGILL, Circuit Judge.

In this appeal, we are asked to decide the effect of Treasury Regulation § 1.861–8 (as amended in 1977) on computations requiring application of the intercompany pricing rules of the domestic international sales corporation (DISC) statute, I.R.C. §§ 991–997. St. Jude Medical, Inc. (St. Jude) challenges the United States Tax Court's decision that the Commissioner of the Internal Revenue (the Commissioner) correctly assessed a tax deficiency against it for tax years 1981, 1982, and 1983. The tax court found that, in DISC combined taxable income (CTI) computations, St. Jude improperly allocated research and development (R & D) expenditures [1] related to (1) its attempt to develop an insulin pump and a cardiac pacemaker and (2) its successful heart valve sales. We affirm the tax court's determination as to St. Jude's allocation of heart-valve-related R & D expenditures. We reverse the tax court's holding that St. Jude improperly failed to allocate the insulin pump and pacemaker R & D expenditures to its heart valve gross export receipts and remand to the tax court for further proceedings consistent with this opinion.[2]

## I. BACKGROUND

St. Jude is a domestic corporation that designs, manufactures, and sells medical products. A calendar year taxpayer, St. Jude incurred R & D expenses related to three medical products: an insulin pump, a cardiac pacemaker, and an artificial heart valve. The heart valve research resulted in successful sales both in the United States and in foreign markets. In contrast, the insulin pump and cardiac pacemaker R & D efforts were abandoned, never resulting in a product or in any sales receipts. During the years in question, all gross export receipts resulted from heart valve sales.

To facilitate its export transactions, St. Jude incorporated St. Jude International Sales Corporation (International), a wholly-owned subsidiary, and qualified it as a DISC.

---

1. We refer to these expenditures as research and development expenditures. The term "research and experimental expenditures" is used interchangeably by the parties and, at times, the regulations.

2. The Internal Revenue Code (the Code) and Treasury Regulation sections cited are those in effect for the tax years in question.

St. Jude was required by the DISC statute's intercompany pricing rules, *see* I.R.C. § 994, to calculate the DISC's commission and hence its taxable income through specific methods, one of which was the CTI method. In calculating CTI, St. Jude failed to allocate a portion of the unsuccessful insulin pump and cardiac pacemaker R & D expenditures to International and St. Jude's gross export receipts as required by § 1.861–8. St. Jude contended that § 1.861–8 was invalid as it applied to those allocations. Further, St. Jude failed to allocate its artificial heart valve R & D expenditures to its gross export receipts in DISC CTI computations, contending that § 223 of the Economic Recovery Tax Act of 1981 (ERTA), Pub.L. No. 97–34, 95 Stat. 172, 249, exempted it from doing so.

In 1988, the Commissioner notified St. Jude of a tax deficiency for calendar years 1979 to 1983. St. Jude petitioned the tax court for redetermination of the deficiencies, first resolving with the Commissioner all issues other than the proper allocation of R & D expenditures for calendar years 1981 through 1983. No factual issues were in dispute. The tax court held that St. Jude improperly failed to allocate its insulin pump and pacemaker R & D expenditures to its heart valve gross export receipts. The tax court also held that St. Jude improperly apportioned its heart-valve-related R & D expenditures in its CTI computations. St. Jude timely appealed.

## II. DISCUSSION

We are presented with two legal issues in this appeal: (1) whether § 1.861–8(e)(3) could validly be applied to require International and St. Jude to include in their CTI computation the expenses related to the unsuccessful insulin pump and pacemaker R & D and (2) whether § 223 of ERTA, suspending § 1.861–8, exempted St. Jude and International from including *any* domestically performed R & D expenditures—specifically, the artificial heart valve R & D expenditures—in their CTI computation during the time ERTA was in effect (the ERTA Moratorium). Our review of legal questions is de novo. *Estate of Robertson v. Commissioner,* 15 F.3d 779, 781 (8th Cir.1994). We hold

that § 1.861–8(e)(3) is invalid as applied to DISC CTI computations. We further hold that § 223 of ERTA did not permit St. Jude and International to avoid allocating and apportioning any of their heart-valve-related R & D expenditures to their heart valve gross export receipts in their CTI computation. We review the relevant law and analyze these issues in turn.

### A. The Statutory Framework

#### 1. The DISC Legislation

In 1971, Congress enacted the DISC statute intending to provide tax incentives to domestic firms, thereby increasing exports. At that time, Congress believed that domestic firms exporting goods in a foreign market were at a disadvantage as compared to foreign subsidiaries of domestic corporations. H.R.Rep. No. 533, 92d Cong., 1st Sess. 57, 58 (1971) [hereinafter H.R.Rep. No. 533], *reprinted in* 1971 U.S.C.C.A.N. 1825, 1872. Prior to the enactment of the DISC legislation, domestic companies directly marketing their goods in a foreign market were taxed on "their foreign earnings at the full U.S. corporate income tax rate regardless of whether [the] earnings [were] kept abroad or repatriated." *Id.*

The DISC statute permitted a domestic corporation to set up a DISC, a subsidiary incorporated under "the laws of any State." I.R.C. § 992(a)(1). A corporation could elect to be treated as a DISC if it satisfied several specific requirements. *See id.* Most significantly, "95 percent or more of the gross receipts [of a DISC must] consist of qualified export receipts." *Id.* § 992(a)(1)(A). Once qualified as a DISC, such a corporation's profits were generally not subject to taxation. *Id.* § 991. However, the DISC's shareholders were taxed on a portion of the DISC's profits in the form of a deemed dividend. *See id.* § 995. The remainder of DISC profit was not taxable until it was distributed to the shareholder, typically upon the dissolution or disqualification of the DISC. *See e.g., id.* § 995(b)(2). The shareholder's yearly deemed dividend attributable to qualified export receipts was taxed as foreign source income, I.R.C. § 862(a)(2),

thus qualifying for a corresponding foreign tax credit, *id.* §§ 901, 904.

The incentive created by Congress in the DISC legislation allowed the domestic corporation, the shareholder of the DISC, to defer from U.S. taxation a significant portion of the DISC profits. Congress also set up DISC intercompany pricing rules abrogating arms length pricing as the basis for sales or exchanges between the domestic parent corporation and the DISC. *See* H.R.Rep. No. 533 at 59, *reprinted in* 1971 U.S.C.C.A.N. at 1873. The intercompany pricing rules were intended to

> avoid the complexities of the [arms length] pricing rules in the case of sales by a domestic parent corporation ... to a DISC and also to provide encouragement for the operation of DISC's.... [P]ricing rules ... may be used in determining the permissible profits—although in excess of profit under arm's length rules and regardless of the sales price actually charged—which a DISC may earn on products which it purchases from a related company and then resells for export.

H.R.Rep. No. 533 at 73, *reprinted in* 1971 U.S.C.C.A.N. at 1887.

The intercompany pricing rules, codified in § 994, permitted a taxpayer to use one of three methods for determining the amount of deemed profit allocated to the DISC and its parent as a result of export sales. *See* I.R.C. § 994(a).[3] The taxpayer/parent could choose the method resulting in the greatest amount of profit. *Id.* The greater the DISC profit,

the larger the amount of tax-deferred income and the larger the deemed dividend. Thus, a shareholder, such as St. Jude, had an incentive to maximize DISC profit. The intercompany pricing rules, intended as an export incentive, allowed DISCs and parent corporations to transfer inventory through either a buy-sell arrangement, with the inventory's deemed price governed by § 994(a), or on a commission basis, with the amount of commission governed by regulations promulgated pursuant to § 994(b)(1).

Under the 1971 DISC statute, a commission DISC, such as International, never took title to the inventory that it sold in the foreign market. Rather, the parent company retained title and the DISC was paid a commission for selling the goods in the foreign market. The commission income, deemed received by the DISC for its services, was calculated according to methods established by regulation. *See* Treas.Reg. § 1.994–1 (as amended in 1975).

> If any transaction to which section 994 applies is handled on a commission basis for a related supplier by a DISC and such commissions give rise to qualified export receipts under section 993(a)—
>
> (i) The amount of the income that may be earned by the DISC in any year is the amount, computed in a manner consistent with [the sales transfer price], which the DISC would have been permitted to earn under the gross receipts method, the com-

---

**3.** I.R.C. § 994 provided in relevant part:

> Sec. 994. INTER–COMPANY PRICING RULES.
>
> (a) IN GENERAL—In the case of a sale of export property to a DISC by a person described in section 482, the taxable income of such DISC and such person shall be based upon a transfer price which would allow such DISC to derive taxable income attributable to such sale (regardless of the sales price actually charged) in an amount which does not exceed the greatest of—
>
> (1) 4 percent of the qualified export receipts on the sale of such property by the DISC plus 10 percent of the export promotion expenses of such DISC attributable to such receipts.
>
> (2) 50 percent of the combined taxable income of such DISC and such person which is attributable to the qualified export receipts on

such property derived as the result of a sale by the DISC plus 10 percent of the export promotion expenses of such DISC attributable to such receipts, or

> (3) taxable income based upon the sale price actually charged (but subject to the rules provided in section 482).
>
> (b) RULES FOR COMMISSIONS, RENTALS, AND MARGINAL COSTING—The Secretary shall prescribe regulations setting forth—
>
> (1) rules which are consistent with the rules set forth in subsection (a) for the application of this section in the case of commissions, rentals, and other income, and
>
> (2) rules for the allocation of expenditures in computing combined taxable income under subsection (a)(2) in those cases where a DISC is seeking to establish or maintain a market for export property.

bined taxable income method, or [the] section 482 method.

*Id.* § 1.994–1(d)(2).

A commission DISC choosing to use the CTI method for computing the permissible deemed commission must "allocat[e] expenditures in computing combined taxable income," I.R.C. § 994(b)(2).[4] The DISC statute did not define the term CTI, nor did the statute provide a method for "allocat[ing] expenditures in computing combined taxable income," *id.* The term CTI, however, was defined in § 1.994–1.

> [T]he combined taxable income of a DISC and its related supplier from a sale of export property is the excess of the gross receipts ... of the DISC from such sale over the total costs of the DISC and related supplier which relate to such gross receipts.

Treas.Reg. § 1.994–1(c)(6). "The amount of the income that may be earned by the [commission] DISC in any year is [an] amount[ ] computed in a manner consistent with [§ 1.994–1] paragraph (c)." *Id.* § 1.994–1(d)(2)(i). Accordingly, the related costs of the DISC and its related supplier were subtracted from gross receipts in the CTI computation. The method of allocating these

---

4. Section 994(b)(2) applied to buy-sell DISCs referred to in § 994(a)(2). Consistent regulations were authorized by § 994(b)(1) for commission DISCs. Furthermore, Treasury Regulation § 1.994–1(d)(2)(i) incorporated commission DISCs in the allocation rules authorized by § 994(b)(2).

5. Section 1.994–1(c)(6)(iii) provided:
 (iii) Costs (other than cost of goods sold) which shall be treated as relating to gross receipts from sales of export property are (a) the expenses, losses, and other deductions definitely related, and therefore allocated and apportioned, thereto, and (b) a ratable part of any other expenses, losses, or other deductions which are not definitely related to a class of gross income, determined in a manner consistent with the rules set forth in § 1.861–8.

6. Section 1.994–1(c)(6)(iv) provided:
 (iv) The taxpayer's choice in accordance with subparagraph (7) of this paragraph as to the grouping of transactions shall be controlling, and costs deductible in a taxable year shall be allocated and apportioned to the items or classes of gross income of such taxable year resulting from such grouping.
 Subparagraph (7) provided in relevant part:

---

costs was also defined by regulation, as authorized by § 994(b)(2).

Section 1.994–1(c)(6)(iii) provided that costs definitely related to the sales of export property should be allocated and apportioned to that property "in a manner consistent with the rules set forth in § 1.861–8."[5] Section 1.994–1(c)(6)(iv) further provided that the taxpayer's choice as it pertained to the grouping of transactions was controlling.[6] We examine § 1.861–8 because § 1.994–1(c)(6) incorporated its rules into its directions for calculating CTI.

**2. The Sourcing Rules**

Treasury Regulation § 1.861–8 provided specific guidance for applying the allocation and apportionment rules referred to in I.R.C. §§ 861, 862, and 863.[7] Treas.Reg. § 1.861–8(a)(1). Section 1.861–8 also provided rules for determining taxable income from specific sources and activities under other sections of the Code. *See, e.g., id.* § 1.861–8(f)(1)(i)–(vi). Included by reference in § 1.861–8 was § 1.994–1's DISC CTI computation. *See id.* § 1.861–8(f)(1)(iii).

Of particular importance to this case is § 1.861–8(e)(3), which provided the general rules for allocating and apportioning re-

---

(7) Grouping Transactions. (i) Generally, the determinations under this section are to be made on a transaction-by-transaction basis. However, at the annual choice of the taxpayer some or all of these determinations may be made on the basis of groups consisting of products or product lines.
(ii) A determination by a taxpayer as to a product or a product line will be accepted by a district director if such determination conforms to any one of the following standards: (a) a recognized industry or trade usage, or (b) the two-digit major groups (or any inferior classifications or combinations thereof, within a major group) of the Standard Industrial Classification as prepared by the Statistical Policy Division of the Office of Management and Budget, Executive Office of the President.

7. Sections 861, 862, and 863 of the Code "undertake[ ] to classify the sources of income within the United States and without the United States by the nature and location of the activities of the taxpayer or his property which produces the income." *Commissioner v. Ferro–Enamel Corp.*, 134 F.2d 564, 566 (6th Cir.1943).

search and experimental expenditures.[8] Because § 1.861–8(e)(3) "recognize[d] that research and development is an inherently speculative activity [and] that findings may contribute unexpected benefits," *id.* § 1.861–8(e)(3)(i), it deemed that "gross income derived from successful research and development must bear the cost of unsuccessful research and development," *id.* As a result, § 1.861–8(e)(3) deemed a definite relationship between an expenditure for R & D and all income reasonably connected with a specific broad product category. *Id.* For example, according to the regulation, St. Jude's R & D expenditures for the insulin pump, the pacemaker, and the artificial heart valve were all related to income from Standard Industrial Classification (SIC) 38: that group included measuring, analyzing, and controlling instruments; photographic, medical, and optical goods; and watches and clocks.

### 3. The Economic Recovery Tax Act of 1981 (ERTA)

Section 1.861–8 required companies doing business in a foreign market to allocate a portion of their deduction for domestically

performed R & D expenditures to their foreign source income. As a result, companies had either a decreased incentive to export their goods or an incentive to move their R & D efforts to the foreign market where the company could receive improved tax benefits. H.R.Rep. No. 201, 97th Cong., 1st Sess. 130–32 (1981).

Prior to 1981, a company receiving foreign source income and taxed on that income by a foreign nation typically could not receive a foreign deduction for its domestically performed R & D. *Id.* That same company was also taxed on the foreign source income by the United States, but the taxable income was reduced by the R & D deduction, thus resulting in lower U.S. tax liability. *Id.* Because the maximum allowable foreign tax credit is limited by the U.S. tax liability, the foreign source income was effectively taxed at a higher rate. Consequently, the objective of the foreign tax credit—to prevent double taxation—was thwarted by § 1.861–8. *Id.* Concerned that § 1.861–8 had a negative impact on the economy, Congress promulgated § 223 of ERTA,[9] temporarily suspending the

---

**8.** Section 1.861–8(e)(3)(i) provided:

(3) Research and experimental expenditures—(i) Allocation—(A) In general. The methods of allocation and apportionment of research and development set forth in this paragraph (e)(3) recognize that research and development is an inherently speculative activity, that findings may contribute unexpected benefits, and that the gross income derived from successful research and development must bear the cost of unsuccessful research and development. Expenditures for research and development which a taxpayer deducts under section 174 shall ordinarily be considered deductions which are definitely related to all income reasonably connected with the relevant broad product category (or categories) of the taxpayer and therefore allocable to all items of gross income as a class (including income from sales, royalties, and dividends) related to such product category (or categories). For purposes of this allocation, the product category (or categories) which a taxpayer may be considered to have shall be limited to the following list. Ordinarily a taxpayer's research and development expenditures may be divided between the relevant product categories. Where research and development is conducted with respect to more than one product category, the taxpayer may aggregate the categories for purposes of allocation and apportionment; however, the taxpayer may

not subdivide the categories in this list. Where research and development is not clearly identified with any product category (or categories), it will be considered conducted with respect to all the taxpayer's product categories. The individual products included within each category are enumerated in Executive Office of the President, Office of Management and Budget, Standard Industrial Classification Manual, 1972 (or later edition, as available).

**9.** Section 223 stated:

SUSPENSION OF REGULATIONS RELATING TO ALLOCATION UNDER SECTION 861 OF RESEARCH AND EXPERIMENTAL EXPENDITURES.

(a) 2–YEAR SUSPENSION.—In the case of the taxpayer's first 2 taxable years beginning within 2 years after the date of the enactment of this Act, all research and experimental expenditures (within the meaning of section 174 of the Internal Revenue Code of 1954) which are paid or incurred in such year for research activities conducted in the United States shall be allocated or apportioned to sources with the United States.

(b) STUDY—

(1) IN GENERAL.—The Secretary of the Treasury shall conduct a study with respect to the impact which section 1.861–8 of the Internal Revenue Service Regulations would have

application of § 1.861–8 to R & D expenditures and allocating those expenditures solely to U.S. source income pending further study. *Id.*

## B. Validity of the Application of Section 1.861–8(e)(3) to CTI Computations

St. Jude allocated neither its insulin pump nor its pacemaker R & D expenditures against its artificial heart valve export receipts in its CTI computations. Section 1.861–8(e)(3)(i) required it to do so. St. Jude contends the Commissioner could not validly apply the broad SIC categories contained in § 1.861–8(e)(3)(i) to its R & D expenditures because the insulin pump and pacemaker expenses were not definitely related to receipts from heart valve sales. The Commissioner, in response, contends that § 1.861–8 deems insulin pumps and pacemakers to be factually related to heart valve export receipts, and that this deemed relationship is in harmony with the origin and purpose of the DISC statute. The tax court agreed with the Commissioner. We disagree.

■ We defer to the Commissioner's regulatory interpretations of the Code so long as they are reasonable. *See Cottage Sav. Ass'n v. Commissioner,* 499 U.S. 554, 561, 111 S.Ct. 1503, 1508, 113 L.Ed.2d 589 (1991) (citing *National Muffler Dealer's Ass'n v. United States,* 440 U.S. 472, 476–77, 99 S.Ct. 1304, 1306–07, 59 L.Ed.2d 519 (1979)). "In determining whether a particular regulation carries out the congressional mandate in a proper manner, we look to see whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose." *National Muffler,* 440 U.S. at

477, 99 S.Ct. at 1307 (describing the reasonableness requirement).[10] We may further consider the span of time between the enactment of the statute and promulgation of the regulation, the length of time the regulation has been in effect, the evolution of the regulation, the reliance placed on the regulation, the consistency of the Commissioner's interpretation, and the degree of congressional scrutiny. *Id.*

■ Congress authorized the Commissioner in the DISC statute to promulgate (1) intercompany pricing rules applicable to commission DISCs *consistent* with the statutory buy-sell pricing rules, *see* I.R.C. § 994(b)(1); and (2) rules for the allocation of expenditures in computing CTI for buy-sell DISCs, *id.* § 994(b)(2). Congress thus specifically authorized the Commissioner to promulgate commission intercompany pricing rules and CTI expenditure allocation rules. In deciding whether § 1.8618(e)(3)'s SIC categories may validly be applied to carry out Congress's mandate in the DISC statute, we must examine the origin and purpose of the DISC statute.[11] *See National Muffler,* 440 U.S. at 477, 99 S.Ct. at 1307.

We interpret § 994(b) to have authorized the promulgation of CTI allocation rules for commission DISCs consistent with those of buy-sell DISCs. However, we find nothing in the plain language of the statute to guide us further in our analysis. We learn from the legislative history that the DISC statute was intended to allow DISCs to earn profits in excess of those earned under the arms length pricing rules. *See* H.R.Rep. No. 533 at 73, *reprinted in* 1971 U.S.C.C.A.N. at

(A) on research and experimental activities conducted in the United States and (B) on the availability of the foreign tax credit.

(2) REPORT.—Not later than the date 6 months after the date of the enactment of this Act, the Secretary of the Treasury shall submit to the Committee on the Ways and Means of the House of Representatives and the Committee on Finance of the Senate a report on the study conducted under paragraph (1) (together with such recommendations as he may deem advisable).

**10.** *National Muffler*'s standard, although enunciated well before *Chevron U.S.A., Inc. v. National Resources Defense Council, Inc.,* 467 U.S. 837,

843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), is still cited with approval. *See Cottage Sav. Ass'n,* 499 U.S. at 561, 111 S.Ct. at 1508.

**11.** Section 1.861–8(e)(3) was not promulgated pursuant to a specific grant of authority. Its general R & D allocation rules, applicable to multiple operative sections of the Code, were promulgated pursuant to the Commissioner's general grant of authority in I.R.C. § 7805(a). *Accord St. Jude Medical, Inc. v. Commissioner,* 97 T.C. 457, 483, 1991 WL 221136 (1991). We believe that the standard enunciated in *National Muffler* for reviewing such interpretive regulations is consistent with the standard enunciated in *Chevron.*

1887. And, we learn that the pricing rules, embodied in I.R.C. § 994, were generally to be applied on a product-by-product basis, although the rules could be applied on the basis of product lines. H.R.Rep. No. 533 at 74, *reprinted in* 1971 U.S.C.C.A.N. at 1888.

The intended method for allocating expenses in CTI computations appears consistent throughout the legislative history of the DISC statute. The CTI intercompany pricing rule was

> to be determined *generally in accordance with the principles applicable under section 861* for determining the source (within or without the United States) of the income of a single entity with operations in more than one country. These rules generally allocate to each item of gross income all expenses *directly related thereto,* and then apportion other expenses among all items of gross income on a ratable basis. Thus, the combined taxable income of a DISC and a related person with respect to the sale by the DISC of export property would be determined by deducting from the DISC's gross receipts the related person's cost of goods sold with respect to the property, the selling, overhead and administrative expenses of both the DISC and the related person which are directly related to the production or sale of the export property....

H.R.Rep. No. 533 at 74, *reprinted in* 1971 U.S.C.C.A.N. at 1887–89 (emphases added); *accord* S.Rep. No. 437, 92d Cong., 1st Sess. (1971), *reprinted in* 1971 U.S.C.C.A.N. 1918, 2013.[12]

The parties stipulated to the tax court that cardiac pacemakers, insulin pumps, and artificial heart valves were separate products or product lines under recognized industry or trade usage. J.A. at 25. According to § 1.994–1, such taxpayer-made transaction grouping should control and costs should be allocated and apportioned accordingly. Treas.Reg. § 1.994–1(c)(6)(iv). Nonetheless, § 1.861–8(e)(3)(i) *required* the allocation of R & D expenditures against broad SIC categories wider in scope than industry-approved

product lines. According to § 1.861–8(e)(3)(i), the insulin pump and cardiac pacemaker R & D expenditures should be allocated against export receipts resulting from either measuring instruments, analyzing instruments, controlling instruments, medical goods, optical goods, watches or clocks. *See id.* § 1.861–8(e)(3)(i)(A)(38).

Mandating use of the SIC categories is inconsistent with Congress's intent to allow costs to be allocated on a product-by-product basis or on the basis of product lines. *See* H.R.Rep. No. 533 at 73, *reprinted in* 1971 U.S.C.C.A.N. at 1888; S.Rep. No. 437, 92d Cong., 1st Sess., *reprinted in* 1971 U.S.C.C.A.N. at 2014. Moreover, the deemed relationship mandated by § 1.861–8(e)(3)(i) is inconsistent with Congress's intent to "generally allocate to each item of gross income all expenses *directly related thereto.*" H.R.Rep. No. 533 at 74, *reprinted in* 1971 U.S.C.C.A.N. at 1887 (emphasis added). Finally, we note that the SIC categories requiring "gross income derived from successful research and development [to] bear the cost of unsuccessful research and development," Treas.Reg. § 1.861–8(e)(3)(i), are inconsistent with Congress's stated intent to "deduct[ ] from the DISC's gross receipts ... [the] cost of goods sold with respect to the property, the selling, overhead and administrative expenses of both the DISC and the related person which are directly related to the production or sale of the export property." H.R.Rep. No. 533 at 74, *reprinted in* 1971 U.S.C.C.A.N. at 1888.

In contrast, § 1.994–1(c)(6)(iii), the regulation describing the manner in which the taxpayer is to allocate costs, is consistent with Congress's intent when it promulgated the DISC statute. Section 1.994–1(c)(6)(iii) requires the taxpayer to allocate and apportion costs, such as R & D, that are definitely related to the gross receipts from the sale of the export property. *See* Treas.Reg. § 1.994–1(c)(6)(iii). Although § 1.994–1(c)(6)(iv) and (7) allow a taxpayer the choice of grouping transactions, and hence costs, by SIC groups, the regulation does not mandate such transaction grouping as does § 1.861–8(e)(3). Instead, the regulation mandates

---

**12.** Although we quote from the House Report, the Senate Report uses precisely the same language as the House Report.

that the taxpayer's choice regarding the grouping of transactions shall control as long as it conforms to a recognized industry/trade usage or a SIC group. *Id.* § 1.994–1(c)(6)(iv), (7)(ii). We do not find that this flexibility in the § 1.994–1 regulation violates Congress's purpose or intent when it promulgated the DISC statute.

Section 1.994–1(c)(6)(iii) further requires that CTI costs be allocated and apportioned "in a manner consistent with the rules set forth in § 1.861–8." Treas.Reg. § 1.994–1(c)(6)(iii). This mandate is consistent with the legislative history requiring that the rules "be determined *generally in accordance with the principles applicable under section 861* for determining the source (within or without the United States) of the income of a single entity with operations in more than one country." H.R.Rep. No. 533 at 74, *reprinted in* 1971 U.S.C.C.A.N. at 1887 (emphasis added). Thus, we find, on one hand, that Congress authorized § 1.994–1(c)(6)'s incorporation of § 1.861–8, and on the other hand, that § 1.861–8 is inconsistent with the DISC statute's purpose.

We are left with a conflict between two Treasury regulations: § 1.994–1 and § 1.861–8. Section 1.994–1 allows the taxpayer's choice regarding the manner of grouping transactions to control. Section 1.861–8 mandates a specific method of grouping transactions. The first regulation, § 1.994–1, was promulgated to interpret the DISC intercompany pricing rules. The second regulation, § 1.861–8, was promulgated to "state in general terms how to determine taxable income of a taxpayer from sources within the United States after gross income from sources within the United States has been determined." Treas.Reg. § 1.861–8(a)(1). Because § 1.861–8 only affects CTI

computations through § 1.994–1(c)(6)(iii)'s incorporation of its rules, we must analyze the source of § 1.994–1(c)(6)(iii)'s authority for incorporating § 1.861–8.[13] And, we must decide, in light of that history, whether applying § 1.861–8's mandate to CTI computations "carries out the congressional mandate in a proper manner," *National Muffler,* 440 U.S. at 477, 99 S.Ct. at 1307.

In DISC CTI computations, Congress intended for expenditures to be allocated "generally in accordance with the principles applicable under section 861." H.R.Rep. No. 533 at 74, *reprinted in* 1971 U.S.C.C.A.N. at 1887. The language of I.R.C. § 861 mirrored the language contained in the DISC legislative history, *see* H.R.Rep. No. 533 at 74, *reprinted in* 1971 U.S.C.C.A.N. at 1887–89. An examination of § 861(b)'s language does not allow us to infer that Congress intended to impose mandatory SIC transaction grouping in CTI computations related to R & D expenditures. *See id.*[14] In fact, § 1.861–8, at the time the DISC legislation was enacted, did not contain the SIC categories, but rather reiterated § 861(b)'s language. *See* Treas.Reg. § 1.861–8 (1957).

After examining the origin and the purpose of the DISC statute, we hold that § 1.861–8 is unreasonable, and thus invalid, as applied to DISC CTI computations. *See National Muffler,* 440 U.S. at 476, 99 S.Ct. at 1306.[15] We believe Congress intended in CTI computations to allocate costs, such as R & D expenditures, to definitely related gross export receipts. *See, e.g.,* Treas.Reg. § 1.994–1(c)(6)(iii). Although a taxpayer may choose to allocate R & D expenditures to SIC categories consistent with Congress's intent when it promulgated the DISC intercompany pricing rules, mandating that a taxpayer do so is inconsistent with congressional intent. Doing so may improperly decrease

---

**13.** We note that § 1.994–1(c)(6)(iii) was promulgated before the 1977 version of § 1.861–8 that is at issue here.

**14.** Section 861(b) provided in relevant part:

(b) TAXABLE INCOME FROM SOURCES WITHIN THE UNITED STATES.—From the items of gross income specified in subsection (a) as being income from sources within the United States there shall be deducted the expenses, losses, and other deductions properly apportioned or allocated thereto, and a ratable part of any expenses, losses, or other deduc-

tions which cannot definitely be allocated to some item or class of gross income.

**15.** In making this determination, we have not ignored the length of time the regulation has been in effect. However, in light of its turbulent history, *see, e.g.,* Senate Committee on Finance, 98th Cong., 2d Sess., Explanation of the Provisions Approved by the Committee on March 21, 1984 for the Deficit Reduction Act of 1984 (Comm. Print 1984), we decline to weigh heavily this factor.

the profits allocated to a DISC, thus thwarting Congress's intent when it promulgated the DISC intercompany pricing rules.

## C. The Effect of the ERTA Moratorium on DISC CTI Computations

■ St. Jude argues on appeal that § 223 of ERTA exempts it from allocating any R & D expenditures against its gross export receipts when calculating CTI under the intercompany pricing rules. In response, the Commissioner claims that ERTA does not apply to CTI computations and was intended to affect only determinations involving the allocation and apportionment of R & D expenditures for geographic sourcing purposes. According to the Commissioner, CTI computations simply do not require geographic sourcing allocations. The tax court agreed with the Commissioner, and so do we.

The ERTA Moratorium required that all research and experimental expenditures for activities conducted in the United States be allocated to sources within the United States. *See supra* note 9. Section 223 required (1) the suspension of regulations relating to allocation under § 861 and (2) the allocation or apportionment of domestically performed R & D expenditures to "sources within the United States." We must decide the scope of ERTA's mandate regarding domestic R & D allocations, that is, whether ERTA's language applies to DISC CTI computations.[16]

St. Jude and International's CTI computation required them to allocate R & D expenditures, *see* Treas.Reg. § 1.994–1(c)(6)(iii), to gross export receipts from the sale of heart valves. *See id.* St. Jude relies upon ERTA's language mandating the allocation or apportionment of domestically performed R & D expenditures to "sources within the United States" and contends that this language applies for all purposes under the Code. We agree that ERTA's legislative history indicates that domestic R & D expenditures must be allocated or apportioned to U.S.

source income for "all purposes under the Code." *See* H.R. Conf.Rep. No. 215, 97th Cong., 1st Sess. 224 (1981), *reprinted in* 1981 U.S.C.C.A.N. 105, 285, 314. We, however, do not believe that ERTA permits a taxpayer to allocate domestic R & D expenditures exclusively to a U.S. source when a calculation does not, in the first instance, require allocation to a geographic source, foreign or domestic.

The CTI computation rules do not require use of geographic sourcing rules. The sourcing rules are relevant when St. Jude is apportioning its R & D expenditures between its U.S. source income and its foreign source income for foreign tax credit purposes. *See, e.g.,* Treas.Reg. § 1.861–8(f)(1)(i), (ii). For those purposes, St. Jude gets a distinct benefit from the ERTA Moratorium: it need not apportion any of its R & D expenditures to the dividend it is deemed to receive from its DISC. All DISC dividends resulting from qualified export receipts are foreign source income. *See* I.R.C. § 861(a)(2)(D).

In contrast, DISC foreign export receipts need not be categorized as foreign source income. For purposes of determining CTI, St. Jude and its DISC are treated as a single taxpayer. *See* I.R.C. § 994(a). In a CTI computation, the two relevant worlds are (1) gross export receipts and (2) all other gross income. *See* Treas.Reg. § 1.861–8(g)(23)(iii). Both worlds may include what could in another calculation be termed "foreign source income." For example, the "all other gross income" category could include foreign source income such as foreign royalty income. *See* I.R.C. § 862(a)(4). But, CTI computations simply do not require that the taxpayer apply a geographic source label.

Attempting to categorize CTI as foreign source or U.S. source income results in potentially disparate results. In a buy-sell DISC, the taxable income of the DISC and the taxpayer is based upon a transfer price that would allow the DISC to derive taxable

---

**16.** Invalidation of § 1.861–8 as applied to CTI computations does not resolve this issue. Neither invalidation nor suspension of § 1.861–8 absolves St. Jude and International from allocating any of its domestic R & D expenditures to its gross export receipts. *See* § 1.994–1(c)(6)(iii) (requiring the allocation of definitely related costs). Only if § 223's language mandating allocation or apportionment to "sources within the United States" applies to CTI computations would the ERTA Moratorium permit the nonallocation of definitely related R & D expenditures.

income attributable to the sale, regardless of the price charged. I.R.C. § 994(a). CTI for buy-sell DISCs determines an illusory price that the domestic/taxpayer corporation charges its domestic subsidiary (the DISC) for goods which it owned. This is a wholly domestic transaction that in theory involves only U.S. source income. *See, e.g.,* Treas. Reg. § 1.861–8(g)(23)(iii) ("gross income from exports through a DISC and gross income from sales within the United States are both within the same geographic source, United States income"). In contrast, CTI computations for commission DISCs calculate an illusory commission that will be paid by the domestic/taxpayer for a sale made by the DISC in a foreign market. The DISC never owns the goods, but the DISC in theory has performed a service in a foreign market for which it is paid. This commission income could be categorized as foreign source income. *See* I.R.C. § 862(a)(3) (foreign source income includes compensation for labor or personal services performed without the United States). Using this analysis, it is possible to argue that domestic R & D expenditures should be deducted from the gross export receipts of buy-sell DISCs but not from the gross export receipts of commission DISCs. Such an analysis would create a conflict between § 223 of ERTA and § 994, which requires that commission DISCs have consistent intercompany pricing rules with buy-sell DISCs. We do not believe that Congress intended this result.

St. Jude's ERTA claim, made without reference to a sourcing rule, is based on an *assumption* that the "gross export receipts" used in CTI computations are foreign source income. St. Jude appears to claim that either the DISC or St. Jude have sold domestically made goods in a foreign market and thus the resulting income must be foreign source income. *See id.* § 862(a)(6). This view is inconsistent with the purpose behind § 994's intercompany pricing rules. The § 994 intercompany pricing rules were intended to determine a favorable transfer price between the DISC and the domestic/taxpayer corporation. *See* H.R.Rep. No.

533 at 59, *reprinted in* 1971 U.S.C.C.A.N. at 1873. If ERTA applied to CTI computations, the computed transfer price would fail to include a significant cost of developing the goods.

Furthermore, we believe our view is consistent with ERTA's legislative history.

> Taxpayers that allocate research and development expenses for purposes of the foreign tax credit claim that the allocation results in more deductions being allocated overseas than is allowed as a deduction by the foreign country. Thus, taxpayers claim that their foreign tax credit limitation is lower than the foreign taxes paid and that they will lose foreign tax credits.
>
> Taxpayers argue that because of the application of the regulation, they must transfer research and development activities to the foreign country in order to get a deduction in that country and, thus, get a full foreign tax credit on the income earned in that country. The committee believes that the transfer of research and development activities overseas would not be in the best interest of the United States. Therefore, the committee has concluded that the Treasury should study the impact of the allocation of research and development expenses under Treas.Reg. § 1.861–8 on U.S.–based research and development activities.

H.R.Rep. No. 201, 97th Cong., 1st Sess. 131 (1981).[17] ERTA's legislative history reveals that Congress intended through § 223 to halt the deleterious effects § 1.861–8 had on the foreign tax credit and on domestic R & D incentives.

We recognize that by affecting DISC income, CTI has a significant secondary impact on the foreign tax credit. CTI computations affect the amount of the deemed dividend eventually subject to taxation. But in terms of ERTA's double taxation concerns, CTI is irrelevant. The legislative history does not indicate that Congress intended without restriction to increase export incentives. *Id.; see also* 127 Cong.Rec. 17,459 (1981) (statement of Sen. Glenn).

We hold that the ERTA Moratorium did not permit St. Jude and International to avoid allocating any of its heart valve R & D expenditures to gross export receipts in its

---

**17.** Having reviewed materials from both Houses of Congress, we find no substantive conflict in the purpose behind § 223.

CTI computations. Section 223 was intended to allocate domestically performed R & D expenditures to U.S. sources of income when that allocation was part of a tax calculation. The CTI computation simply does not require a taxpayer to allocate R & D expenditures to geographic sources.

### III. CONCLUSION

Accordingly, we reverse in part, affirm in part, and remand to the tax court for further proceedings consistent with this opinion.