258 F.3d 958 (9th Cir. 2001)
 THE BOEING COMPANY, AND CONSOLIDATED SUBSIDIARIES; BOEING SALES CORPORATION, PLAINTIFFS-APPELLEES,
v.
UNITED STATES OF AMERICA, DEFENDANT-APPELLANT.
THE BOEING COMPANY, AND CONSOLIDATED SUBSIDIARIES, PLAINTIFF,
AND
BOEING SALES CORPORATION, PLAINTIFF-APPELLANT,
v.
UNITED STATES OF AMERICA, DEFENDANT-APPELLEE.
 No. 99-35818,, No. 99-35857
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted April 4, 2001--Seattle, Washington
Filed August 2, 2001
 
 [Copyrighted Material Omitted]
 Counsel John B. Magee, McKeen, Nelson, Ernst & Young, Washington, D.C., and Jean A. Pawlow, Miller & Chevalier, Washington, D.C. for the plaintiffs-appellees/cross-appellants.
 David English Carmack and Frank Cihlar, United States Department of Justice, Tax Division, Washington, D.C., for the defendant-appellant/cross-appellee.
 D.C. No. CV-96-01990-JCC Appeal from the United States District Court for the Western District of Washington John C. Coughenour, District Judge, Presiding
 Before: David R. Thompson, Stephen S. Trott, and Richard A. Paez, Circuit Judges.
 
 Thompson, Circuit Judge
 
 1
 The United States appeals the district court's summary judgment determining that the Boeing Company and its consolidated subsidiaries ("Boeing") are entitled to an income tax refund of approximately $419 million for the years 1979 through 1987. The issue is how research and development costs ("R&D") should be accounted for in computing Boeing's net income from export sales of commercial airplanes under the Internal Revenue Code's export incentive provisions for a Domestic International Sales Corporation ("DISC") and a Foreign Sales Corporation ("FSC").
 
 
 2
 We have jurisdiction under 28 U.S.C. §§ 1291 (1994). We conclude that, in computing Boeing's net income, the Commissioner of Internal Revenue properly applied Treas. Reg. §§ 1.861-8(e)(3) to allocate Boeing's R&D costs to its export sales. Accordingly, we reverse the district court's summary judgment granting Boeing's tax refund claim.[1]
 
 FACTS
 
 3
 From 1972 to 1984, Boeing exported commercial airplanes through its subsidiary, Boeing International Sales Corporation, which qualified as a DISC under Internal Revenue Code ("I.R.C.") §§ 992. After 1984, Boeing exported commercial airplanes through its subsidiary, Boeing Sales Corporation, which qualified as a FSC under I.R.C. §§ 922.
 
 
 4
 During the relevant period, Boeing maintained separate "programs" for each of its major commercial airplane product lines.[2] Each of Boeing's programs constitutes a separate product or product line under industry practice and trade usage in the commercial airplane business.
 
 
 5
 In developing these programs, Boeing segregated its R&D costs into two broad categories. The first category, Blue-Sky R&D, was for R&D costs incurred prior to Boeing's Board of Directors giving approval for a new airplane model, which approval was referred to as "Program Go Ahead. " Blue Sky R&D included basic research relating to commercial airplanes that might be the precursor to a specific program. The second category, Company Sponsored Product Development, was for costs incurred for a specific program after Program Go Ahead had been given for a particular airplane model and included the R&D cost of designing, developing, testing and qualifying that airplane. Approximately 77 percent of the R&D costs in the tax years at issue in this case fall within the Company Sponsored Product Development category.
 
 
 6
 For accounting purposes, Boeing apportioned Blue Sky R&D to all of its airplane programs, but allocated Company Sponsored Product Development R&D directly to the particular program for which those costs were incurred. Boeing deducted all R&D costs in the period in which they were incurred, regardless of whether there were any corresponding sales during that period. This meant that significant R&D costs for any new program could be allocated to that program in years prior to any sales of airplanes within that program.
 
 
 7
 Boeing used the combined taxable income method ("CTI") to calculate the intercompany price and profits from its export sales. See I.R.C. §§§§ 994(a)(2) & 925(a)(2). Pursuant to Treas. Reg. §§ 1.994-1(c)(7), Boeing grouped its export sales by program and apportioned costs, including R&D costs, to the particular airplane program for which those costs were incurred. If those R&D costs exceeded the amount of sales for the airplane program to which those costs were allocated, the excess of costs over sales, according to the IRS, simply"disappeared," in that those costs were not accounted for by Boeing in computing its CTI.
 
 
 8
 During an audit, the IRS determined that Boeing's method of allocating its R&D costs to its DISC and FSC sales violated Treas. Reg. §§ 1.861-8(e)(3), which requires all R&D costs to be allocated to and apportioned among all sales within the broad product categories set forth in the Office of Management and Budget's Standard Industrial Classification ("SIC"). Because all of Boeing's commercial airplane sales fell within SIC code 37 (Transportation Equipment), the IRS allocated all of Boeing's R&D costs in a given period to all of Boeing's commercial airplane sales in that period. By this method of allocation, none of the R&D expenses "disappeared" (the government's characterization); instead, all of such expenses were charged to sales in the relevant period.
 
 
 9
 This method of allocation by the IRS caused a substantial decrease in Boeing's net income from its DISC and FSC sales. Because net income from such sales is accorded favorable tax treatment, Boeing's overall income tax liability, according to the IRS, was substantially understated.
 
 
 10
 Boeing paid the amount of additional tax required by the IRS, and timely filed claims for refund. When those claims were denied or not acted upon, Boeing filed this suit seeking a refund of corporate income taxes and interest in the total amount of $458,609,373. Both sides moved for summary judgment. The district court, relying on St. Jude Medical, Inc. v. Commissioner, 34 F.3d 1394 (8th Cir. 1994), accepted Boeing's method of allocating R&D, and granted judgment in favor of Boeing for $419,110,539. This appeal followed.
 
 ANALYSIS
 
 11
 We review de novo a district court's interpretation of the I.R.C. and corresponding treasury regulations. See United States v. Hagberg, 207 F.3d 569, 571 (9th Cir. 2000).
 
 
 12
 Generally, a court must defer to the Commissioner's interpretation of the I.R.C. by the regulations he issues, so long as those regulations "implement the congressional mandate in some reasonable manner." See Redlark v. Commissioner, 141 F.3d 936, 939 (9th Cir. 1998) (quoting Rowan Cos. v. United States, 452 U.S. 247, 252 (1981)). A court has authority to reject the Commissioner's reasoned interpretation and invalidate a regulation only when the I.R.C. section to which the regulation applies has a meaning that is clear, unambiguous, and in conflict with the regulation. See id. (citing Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 841-44 (1984)).
 
 
 13
 When Congress, by explicitly leaving a gap for an agency to fill, delegates authority to the agency to elucidate a specific provision of a statute by regulation, that delegation is "express" and the agency's regulations issued pursuant to the legislation are "legislative regulations." Such regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. See id . at 939-40 (citing Chevron U.S.A., Inc., 467 U.S. at 843-44). If delegation to the agency is implicit, however, a court owes deference only to the agency's reasonable interpretation of the statutory provisions and related regulations. See McLean v. Crabtree, 173 F.3d 1176, 1181 (9th Cir. 1999), cert. denied , 528 U.S. 1086 (2000).
 
 
 14
 Both Treas. Reg. §§§§ 1.861-8(e)(3) and 1.994-1(c) are legislative regulations because they were promulgated pursuant to I.R.C. §§§§ 863(a) and 994(b), which contain explicit grants of authority from Congress. See Black & Decker Corp. v. Commissioner, 986 F.2d 60, 63 (4th Cir. 1993) (explaining that section 863(a) provides express Congressional authorization for Treas. Reg. §§ 1.861-8, which describes the allocation of costs, losses, and deductions derived from domestic and foreign sources); see also I.R.C. §§ 994(b)(2) (granting the Secretary the authority to prescribe regulations "for the allocation of expenditures in computing combined taxable income. . . in those cases where a DISC is seeking to establish or maintain a market for export property").
 
 
 15
 In St. Jude Medical, however, the Eighth Circuit concluded that §§ 1.861-8(a)(3) was promulgated pursuant to the Commissioner's general grant of authority in I.R.C.§§ 7805(a), not pursuant to any express legislative delegation, and as a result the court owed deference only to the IRS's reasonable interpretation of the applicable statutes and regulations. See St. Jude Medical, 34 F.3d at 1400 n.11.
 
 
 16
 In the present case, we need not decide which standard of review applies, because whether we review the Commissioner's interpretation under an "arbitrary or capricious" standard, or under the arguably less deferential "reasonableness" standard, we uphold that interpretation. We agree with the Commissioner that Boeing's method of allocating R&D costs and calculating CTI on its DISC and FSC sales of commercial airplanes violates Treas. Reg. §§ 1.861-8(e)(3)'s requirement for the allocation of "total costs" and that Treas. Reg. §§ 1.861-8(e)(3) is a permissible interpretation of the I.R.C.
 
 
 17
 The DISC and FSC provisions permit a taxpayer to defer or exempt from tax a significant portion of income from export sales. See I.R.C. §§§§ 991-997;§§§§ 921-927.[3] These tax incentives are intended to encourage and increase exports by domestic corporations.
 
 
 18
 Qualified DISCs, which are subsidiaries incorporated under "the laws of any State," are not taxed directly.[4] I.R.C. §§ 992(a)(1). Instead, the parent corporation is taxed on a specified portion of its subsidiary DISC's profits. See I.R.C. §§ 995. The DISC's remaining profits are tax deferred until either they are distributed to the parent corporation or the DISC ceases to meet statutory requirements. See I.R.C. §§ 995(a) & (b).[5]
 
 
 19
 The amount of a DISC's profit depends on the transfer price at which its parent is deemed to have sold to it the product it resells. There are three methods for calculating this transfer price, and thus the amount of taxable income made on export sales. See I.R.C. §§ 994(a). These "intercompany pricing rules" are intended to "avoid the complexities of the [arm's-length] pricing rules . . . and also to provide encouragement for the operation of DISC's." H.R. Rep. No. 92-533, reprinted in 1971 U.S.C.C.A.N. 1825, 1887. Although the intercompany pricing rules permit a DISC to earn profits in excess of the arm's length pricing rules, they also serve to limit the amount of income which can be deferred from taxation. See id.; Intel Corp. v. Commissioner, 76 F.3d 976, 981 (9th Cir. 1996).
 
 
 20
 A taxpayer is permitted to choose the pricing method that maximizes its DISC's profit. See I.R.C.§§ 994. There is an incentive to maximize DISC profit because "[t]he greater the DISC profit, the larger the amount of tax-deferred income and the larger the deemed dividend." St. Jude Medical, 34 F.3d at 1397. Deemed dividends are taxed as foreign source income, which qualifies the parent corporation for a corresponding foreign tax credit. See I.R.C. §§§§ 862(a)(2), 901 & 904.
 
 
 21
 In computing its DISC profits, Boeing chose the combined taxable income (CTI) method described in I.R.C.§§ 994(a)(2), which permits such profits to be computed on the basis of fifty percent of the "combined taxable income . .. attributable to the qualified export receipts . . . ." The statute does not define "combined taxable income." Instead,"combined taxable income" is defined in Treas. Reg. §§ 1.994-1(c)(6), which states:
 
 
 22
 [T]he combined taxable income of a DISC and its related supplier from a sale of export property is the excess of the gross receipts (as defined in section 993(f)) of the DISC from such sale over the total costs of the DISC and related supplier which relate to such gross receipts. 26 C.F.R. §§ 1.994-1(c)(6) (emphasis added).
 
 
 23
 Gross receipts are "the total receipts from the sale . . . of property held primarily for sale . . . in the ordinary course of trade or business, and gross income from all other sources," but do not include interest with respect to the sales. 26 U.S.C. §§ 993(f); 26 C.F.R. §§ 1.994-1(c)(6).
 
 
 24
 Generally, the pricing of goods sold by a supplier (the taxpayer) to its DISC should be made on a transaction-by transaction basis. Id. §§ 1.994-1(c)(7). However, the taxpayer may elect to determine the price "on the basis of groups consisting of products or product lines." Id. The taxpayer's choice as to the grouping of transactions "shall be controlling," and "costs deductible in a taxable year shall be allocated and apportioned to the items or classes of gross income of such taxable year resulting from such grouping." Id. §§ 1.994-1(c)(6)(iv). The district director must accept this determination if it conforms to a recognized industry or trade usage, or the major groups recognized by the SIC. Id. §§ 1.994-1(c)(7)(ii).
 
 
 25
 Before calculating DISC CTI, the taxpayer must allocate its costs between export sales and domestic sales. The costs of goods sold are determined according to 26 C.F.R.§§ 1.61-3. Id. §§ 1.994-1(c)(6)(ii). Other costs "which shall be treated as relating to the gross receipts from sales of export property are (a) the expenses, losses, and other deductions definitely related, and therefore allocated and apportioned, thereto, and (b) a ratable part of any other expenses, losses or other deductions which are not definitely related to a class of gross income, determined in a matter consistent with the rules set forth in 1.861-8." Id. §§ 1.994-1(c)(6)(iii) (emphasis added).[6] Neither the §§ 1.994 regulations nor the I.R.C. define "definitely related" other than by reference to §§ 1.861-8.
 
 
 26
 Section 1.861-8(b)(2) states "[a] deduction shall be considered definitely related to a class of gross income and therefore allocable to such class if it is incurred as a result of, or incident to, an activity or in connection with property from which such class of gross income is derived." Id. §§ 1.861-8(b)(2). Recognizing that "research and development is an inherently speculative activity, that findings may contribute unexpected benefits, and that the gross income derived from successful research and development must bear the cost of unsuccessful research and development," §§ 1.861-8(e)(3)[7] provides:
 
 
 27
 Expenditures for research and development which a taxpayer deducts under section 174 shall ordinarily be considered deductions which are definitely related to all income reasonably connected with the relevant broad product category (or categories) of the taxpayer and therefore allocable to all items of gross income as a class (including income from sales, royalties, and dividends) related to such product category (or categories) . . . . The individual products included within each category are enumerated in the . . . Standard Industrial Classification Manual.
 
 
 28
 The district court, relying on St. Jude Medical , determined that Treas. Reg. §§ 1.861-8(e)(3) was invalid as applied to DISC CTI computations. In St. Jude Medical, the Eighth Circuit identified three reasons why §§ 1.861-8(e)(3) did not control the computation of DISC combined taxable income. See St. Jude Medical, 34 F.3d at 1401-02. First, the court determined that §§ 1.861-8(e)(3)'s requirement that the taxpayer group its sales under a broad SIC code conflicted with Congress's intent to permit taxpayers to allocate costs by product or product lines under §§ 1.994-1(c)(6)(iv) & (c)(7). Id. at 1401. Second, the court found section §§ 1.861-8(e)(3)(i)'s "deemed" relationship between R&D costs and export sales conflicted with Congress's intent to allocate to each item of gross income only the expenses directly related thereto. Id. Third, the court determined that §§ 1.861-8(e)(3)'s dictate that "gross income derived from successful research and development bear the cost of unsuccessful research and development" was inconsistent with Congress's intent that CTI computations include only those costs that are directly related to the production or sale of export property. Id. Applying a reasonableness standard of review,[8] the Eighth Circuit concluded that Treas. Reg. §§ 1.861-8(e)(3) was unreasonable and invalid as applied to Boeing's DISC CTI computations under §§ 1.994-1(c)(6) & (7). Id. at 1402.
 
 
 29
 We decline to follow the reasoning of St. Jude Medical. Instead, we agree with the Commissioner that Treas. Reg. §§ 1.861 8(e)(3) is consistent with the guidance provided by the relevant I.R.C. provisions. Under I.R.C. §§ 994(a)(2), CTI is to be calculated based on revenue and costs "attributable to" sales in the applicable year. This statutory text does not confine the relevant costs to those "definitely related" to sales of a particular product.
 
 
 30
 The legislative history supports this position. The applicable House Report states:
 
 
 31
 [T]he combined taxable income from the sale of the export property is to be determined generally in accordance with the principles applicable under section 861 for determining the source (within or without the United States) of the income . . . . These rules generally allocate to each item of gross income all expenses directly related thereto, and then apportion other expenses among all items of gross income on a ratable basis. Thus the combined taxable income . . . would be determined by deducting from the DISC's gross receipts the . . . cost of goods sold with respect to the property [and the expenses] of both the DISC and the related person which are directly related to the production or sale of the export property and a portion of the related person's and the DISC's expenses not allocable to any specific item of income, such portion to be determined based on the basis of the ratio of the combined gross income from the export property to the total gross income of the related person and the DISC. H.R. Rep. No. 92-533, at 74, reprinted in 1971 U.S.C.C.A.N. 1825, 1887-1888 (emphasis added).
 
 
 32
 This House Report reflects that Congress recognized some of the costs incurred in a given tax year would not be "directly related" to specific income items. The Report further reflects Congress's intention that those costs not "directly related" would be allocated to export-related sales on a pro rata basis. The Commissioner's application of Treas. Reg. §§ 1.861-8(e)(3) effectuates this Congressional intent.
 
 
 33
 There is no conflict between Treas. Reg. §§ 1.861-8(e)(3) and Treas. Reg. §§ 1.994-1(c)(6). The latter simply substitutes the term "definitely related" for "directly related." Like House Report 92-533, Treas. Reg. §§ 1.994-1(c)(6) contemplates that costs which are not "definitely related" to specific items of income in a given year will be allocated to the combined taxable income of the taxpayer's export-related business. Treas. Reg. §§ 1.994-1(c)(6) is clear in explaining that "total costs . . . which relate to" the receipts from export sales will be allocated to the combined taxable income from such sales and that those "total costs" include both "definitely" and "indefinitely" related costs.
 
 
 34
 To the extent there is any tension between Treas. Reg. §§ 1.861-8(e)(3) and Treas. Reg. §§ 1.994-1(c)(7), the regulations can be harmonized by recognizing that the more narrowly a taxpayer chooses to define income items, the more costs become "indirectly" or "indefinitely " related to specific items of income. The taxpayer is required, nonetheless, to apportion these costs to broader categories of income and allocate them between the taxpayer's export and domestic sales by the proportional method set forth in Treas. Reg. §§ 1.861-8(e)(3).[9] Interpreted in this way, the regulations may be read to give effect to both. See, e.g., United States v. Borden Co., 308 U.S. 188, 198 (1939) ("It is a cardinal principle of construction that . . . [w]hen there are two acts upon the same subject, the rule is to give effect to both if possible."); see also Black & Decker Corp. v. Commissioner, 986 F.2d 60, 65 (4th Cir. 1993) (explaining that the tenets of statutory construction apply with equal force to the interpretation of regulations).
 
 
 35
 We are unpersuaded that Congressional inaction weighs in favor of either of the parties. Since 1977, when the IRS first promulgated Treas. Reg. §§ 1.861-8(e)(3), Congress has both amended the DISC statutory scheme and enacted temporary legislation governing the allocation of R&D costs in other contexts. The government argues that Congress's failure to legislatively override Treas. Reg. §§ 1.861-8(e)(3) as to the computation of DISC CTI signals Congress's approval of that regulation's method for computing such income.[10] The tax court in St. Jude Medical relied in part on this argument. See St. Jude Med., Inc. v. Commissioner, 97 T.C. 457, 485 (1991) ("Congress has repeatedly considered the regulations at issue and . . . has neither modified the allocation and apportionment regulations as applied to the computation of combined taxable income nor expressed its disapproval of the regulations."), aff'd in part and rev'd in part by, 34 F.3d 1394 (8th Cir. 1994). On the other hand, the Eighth Circuit discounted this argument in St. Jude Medical, 34 F.3d at 1402 n. 15, and Boeing argues Congress has failed to act in the seven years since the Eighth Circuit in St. Jude Medical determined that Treas. Reg. §§ 1.861-8(e)(3) was invalid as applied to DISC income determinations. Id. at 1402.
 
 
 36
 The most that can be said from these competing arguments is that Congressional inaction provides no reliable indication of how this case should be resolved. Treas. Reg. §§ 1.861-8(e)(3), however, is a reasonable interpretation of the applicable statutes and regulations. As such, it provides the proper method for allocating Boeing's R&D costs attributable to its export sales of commercial airplanes. Accordingly, we reverse the district court's summary judgment for $419,110,539 in favor of Boeing. We also reverse the district court's partial summary judgment for approximately $1 million in favor of the government, and remand to the district court for further proceedings consistent with this opinion.
 
 
 37
 REVERSED and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 In view of our reversal of the summary judgment for approximately $419 million in favor of Boeing, we also reverse the district court's partial summary judgment for approximately $1 million in favor of the United States, pursuant to Boeing's conditional cross-appeal which the government does not oppose.
 
 
 [2]
 During the tax years at issue, Boeing established or maintained a separate program for the following airplane models -707, 727, 737, 737-300, 747, 757 and 767.
 
 
 [3]
 The DISC provisions were enacted in 1971. The FISC provisions were enacted in 1984 to cure some problems with the DISC provisions. See Deficit Reduction Act of 1984, Pub. L. No. 98-369, 98 Stat. 494. Because the differences between these statutory schemes are not relevant to this appeal, we generally discuss only the DISC provisions.
 
 
 [4]
 Prior to the enactment of the DISC legislation, domestic corporations which directly marketed their products in a foreign market were taxed on their foreign earnings "at the full U.S. corporate income tax rate regardless of whether [the] earnings [were] kept abroad or repatriated." H.R. Rep. No. 92-533, reprinted in 1971 U.S.C.C.A.N. 1825, 1872.
 
 
 [5]
 In contrast, a portion of a FSC's profits are permanently exempt from taxation. See I.R.C. §§ 923(a).
 
 
 [6]
 The regulations offer the following as examples of deductions that are generally considered "not definitely related" to any class of gross income -personal interest expense, real estate and sales taxes, medical expenses, charitable contributions, and alimony payments. See 26 C.F.R. §§ 1.861-8(e)(9)(i)-(v).
 
 
 [7]
 In 1996, the provisions of §§ 1.861-8(e)(3) were renumbered and, with amendments not relevant to this appeal, were republished as Treas. Reg. §§ 1.861-17.
 
 
 [8]
 The Eighth Circuit considered"whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose." Id. at 1400 (quoting Nat'l Muffler Dealers Ass'n v. United States, 440 U.S. 472, 477 (1979)). The court also considered "the span of time between the enactment of the statute and promulgation of the regulation, the length of time the regulation has been in effect, the evolution of the regulation, the reliance placed on the regulation, the consistency of the Commissioner's interpretation, and the degree of congressional scrutiny." Id.
 
 
 [9]
 If the regulations were truly in conflict, Treas. Reg. §§ 1.861-8(e)(3) would likely control as the later and more specific regulation. See United States v. Carper, 24 F.3d 1157, 1159 (9th Cir. 1994).
 
 
 [10]
 Beginning with the Economic Recovery Tax Act of 1981 §§ 223, Pub. L. No. 97-34, 95 Stat. 172, 249, Congress placed a two-year moratorium on Treas. Reg. §§ 1.861-8(e)(3) to the extent it was being used to determine whether particular income was foreign source or United States source income. This moratorium was extended an additional two years by the Deficit Reduction Act of 1984 §§ 126, Pub. L. No. 98-369, 98 Stat. 494, 648 and an additional year by the Consolidated Omnibus Budget Reconciliation Act of 1985 §§ 13211, Pub. L. No. 99-272, 100 Stat. 82, 324.